# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF GEORGIA
# AUGUSTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) INDICTMENT NO. |
| | ) |
| v. | ) Count 1 |
| | ) 18 U.S.C. § 371 |
| PATRICK SIADO and | ) Conspiracy |
| OPTIMUS PRIME MARKETING, LLC | ) |
| | ) Counts 2–5 |
| | ) 18 U.S.C. § 1347 |
| | ) Health Care Fraud |
| | ) |
| | ) Forfeiture Allegation |

## THE GRAND JURY CHARGES THAT:

At all times relevant to this Indictment, unless otherwise indicated:

## INTRODUCTION

1. Patrick Siado ("**SIADO**"), aided and abetted by unindicted co-conspirators, through his company, **OPTIMUS PRIME MARKETING, LLC**, ("**OPTIMUS**") engaged in a scheme to obtain reimbursement from Medicare and Medicaid for medically unnecessary "cancer screening" laboratory tests in Georgia and elsewhere.

### The Medicare Program

2. The Medicare Program ("Medicare"), a federal health care program as defined by 18 U.S.C. § 24, provides benefits to persons who are at least 65 years old or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health

and Human Services. Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

3.     Medicare is divided into multiple parts. Medicare Part B covers, among other things, costs relating to medically necessary laboratory tests and procedures.

4.     In order for a laboratory to submit claims to Medicare for performing laboratory tests, such as cancer screening, those tests need to be ordered by a licensed medical provider who has a bona fide physician-patient relationship with the patient, not induced by the unlawful payment of remuneration, and medically necessary, among other requirements.

5.     Claims to Medicare were typically submitted electronically and required certain information, including (a) the Medicare beneficiary's name and identification number, (b) identification of the benefit, item, or service provided or supplied to the Medicare beneficiary, (c) the billing code for the benefit, item, or service, (d) the date upon which the benefit, item, or health services was provided, and (e) the name and NPI of the physician that ordered the service, treatment, benefit, or item.

## The Medicaid Program

6.     The Medicaid Program ("Medicaid"), a federal healthcare program as defined by 18 U.S.C. § 24, is jointly funded by the federal government and its participating states. Medicaid assists in providing for medical items, services, and benefits to those who because of financial circumstances, or otherwise, would typically not be able to afford such medical items, benefits, or services.

2

7.     At the federal level, Medicaid is administered by CMS. In Georgia, the Medicaid program is administered by the Georgia Department of Community Health ("DCH"). Within broad limits set by federal law, DCH is responsible for administering the program and establishing the rules and regulations which determine how benefits, items, and services are covered and reimbursed.

8.     A fundamental requirement for all Medicaid services and benefits to be covered and paid for is that the service must be medically necessary and within accepted professional standards of practice.

9.     Medicaid covers laboratory tests and services which are medically necessary and requested by an attending or consulting physician. The services must also be provided in compliance with all federal and state laws including, but not limited to, the Federal Anti-Kickback statute.

10.     Claims are submitted to Medicaid electronically must contain certain information in order to be processed and paid. Such information includes (a) the Medicaid beneficiary's name and identification number, (b) identification of the benefit, item, or service provided or supplied to the Medicaid beneficiary, (c) the billing code for the benefit, item, or service, (d) the date upon which the benefit, item, or service was provided, and (e) the name and NPI for the physician that ordered the service, benefit, or item.

## Cancer Genomic Tests

11.     Cancer genomic ("CGx") testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of

3

cancers in the future. CGx testing was not a method of diagnosing whether an individual presently had cancer.

12.     Medicare did not cover diagnostic testing that was not "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." Title 42, United States Code, Section 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." Title 42, Code of Federal Regulations, Section 41 1.15(a)(1). Among the statutory exceptions Medicare covered were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

13.     If diagnostic testing were necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that, is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and 'who uses the results in the management of the beneficiary's specific medical problem." "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

14.     Because CGx testing did not diagnose cancer, Medicare only covered such tests in limited circumstances, such as when a beneficiary had cancer, and the

4

beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer. Medicare did not cover CGx, testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

15.     Similarly, Medicaid requires that any test for CGx be medically necessary and ordered by an attending or consulting physician. A test is not medically necessary if the ordering physician does not have a bona fide relationship with the beneficiary.

Telemedicine

16.     Telemedicine provides a means of connecting patients to medical practitioners by using telecommunications technology, such as the internet or the telephone, to interact with a patient.

17.     Telemedicine companies provide telemedicine services to individuals by hiring doctors and other health care providers. Telemedicine companies typically pay doctors a fee to conduct consultations with patients. In order to generate revenue, actual telemedicine companies typically either bill insurance or offer a membership program to their customers.

18.     Medicare Part B covers expenses for specified telehealth services if certain requirements are met. These requirements include that (a) the beneficiary is located in a rural or health professional shortage area; (b) services are delivered via an interactive audio and visual telecommunications system; and (c) the beneficiary is at a practitioner's office or a specified medical facility – not at a beneficiary's home – during the telehealth consultation with a remote practitioner.

19.     In Georgia, medical practitioners may engage in the practice of medicine by electronic means if, among other requirements, the practitioner (a) has personally seen and examined the patient and supplements that care by electronic means; (b) is requested to provide care by electronic means by a practitioner who has personally seen and examined the patient; or (c) uses technology and peripherals that are equal or superior to an examination done in person.

### The Anti-Kickback Statute

20.     For items that may be made in whole or in part under a Federal health care program, the Anti-Kickback Statute, Title 42, United States Code, Section 1320a-7b, prohibits a range of knowing and willful conduct. The Anti-Kickback Statute attaches criminal liability to parties on both sides of an impermissible "kickback" transaction. In doing so, it ensures that patient care is based exclusively on what is best for the patient and not upon the financial interest of the person or entity making or arranging for the referral.

21.     Specifically, conduct prohibited under the Anti-Kickback Statute includes offering or paying any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to order any item or to refer an individual to a person for the furnishing of any item or service.

22.     Conduct prohibited under the Anti-Kickback Statute also includes soliciting or receiving any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce

6

such person in return for ordering any item or, alternatively, referring an individual for the furnishing of any item.

## The Defendant and Related Entities

23.     **SIADO** was a resident of Texas who operated a marketing company, **OPTIMUS PRIME MARKETING, LLC**.

24.     Company A was a marketing company operated out of Clearwater, Florida.

25.     Company B was a marketing company operated out of Houston, Texas.

26.     Company C was a laboratory operated out of Doraville, Georgia.

## COUNT ONE
### CONSPIRACY TO DEFRAUD THE UNITED STATES and
### TO PAY AND RECEIVE KICKBACKS
### 18 U.S.C. § 371

**THE GRAND JURY CHARGES THAT:**

27.    The allegations of paragraphs 1 through 26 of this Indictment are hereby realleged and incorporated as if fully set forth herein.

28.    Beginning not later than March 2019, and continuing until on or about July 2019, the exact date being unknown, in the Southern District of Georgia and elsewhere, the defendants herein,

### PATRICK SIADO and OPTIMUS PRIME MARKETING, LLC,

did knowingly and willfully combine, conspire, confederate, and agree with others known and unknown to commit one or more offense against the United States, that is,

a) to defraud the United States through deceitful and dishonest means, the lawful government functions of HHS in its administration and oversight of the Medicare and Medicaid program; and

b) to knowingly and willfully solicit and receive remuneration, including kickbacks, directly and indirectly, overtly and covertly, in cash and in kind to any person to induce a person to order an item for which payment may be made in whole and in part under a federal health care program, that is, Medicare and Medicaid, in violation of Title 42, United States Code, Section 1320a-7b(b)(1);

c) to knowingly and willfully offer and pay remuneration, including kickbacks,

8

directly and indirectly, overtly and covertly, in cash and in kind to any person to induce a person to refer an individual for the furnishing and arranging for the furnishing of an item or service for which payment may be made in whole and in part under a federal health care program, that is, Medicare and Medicaid, in violation of Title 42, United States Code, Section 1320a-7b(b)(2);

### PURPOSE OF THE CONSPIRACY

It was the purpose of the conspiracy for **SIADO**, his coconspirators, and **OPTIMUS**, to unlawfully enrich himself and others by, among other things: (a) causing the submission of false and fraudulent claims to Medicare that were (i) procured by the payment of kickbacks; (ii) medically unnecessary; (iii) ineligible for Medicare and Medicaid reimbursement; and/or (iv) not provided as represented; (b) concealing the submission of false and fraudulent claims to Medicare and Medicaid and the receipt and transfer of the proceeds from the fraud; and (c) using the proceeds of the fraud for the personal use and benefit of **SIADO** and his accomplices.

### MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendant and his co-conspirators sought to accomplish the objects and the purpose of the conspiracy included, among other things:

29.     **SIADO**, and others affiliated with **OPTIMUS**, Company A, and Company B, organized networks of individuals and arranged for their transportation to communities with low-income and elderly individuals within the Southern District of Georgia, Augusta Division, and elsewhere.

30.    **SIADO**, and others affiliated with **OPTIMUS**, Company A, and Company B, went door-to-door to obtain (a) personal identifying information such as Medicare and Medicaid benefit numbers and identities, (b) buccal swabs of saliva.

31.    **SIADO**, and others affiliated with **OPTIMUS**, would then transmit the identities of Medicare and Medicaid beneficiaries and buccal swabs to Company A, a "marketing company."

32.    The co-conspirators would then arrange for a "telemedicine" physician to order the test as "medically necessary" for the patients identified by **SIADO** and **OPTIMUS**, despite the fact that the physician never met the patient, let alone established a legitimate physician-patient relationship, as required.

33.    The co-conspirators would then transmit the identities of Medicare and Medicaid beneficiaries, swabs, and corresponding "telemedicine" physician orders to laboratories, including Company C, which then submitted claims to Medicare and Medicaid.

34.    Company C, among other laboratories, would then bill Medicare and Medicaid using the identities of the individuals gathered by **SIADO** and his network.

35.    **SIADO**, through **OPTIMUS**, would receive a payment for each test "accepted" by the marketing company and laboratory, which involved "sales processed" through the laboratory. Specifically, the terms of the kickback agreed to by **SIADO** and his co-conspirator include

"Accepted Personal CGx Test"- $575

"Accepted Family CGx Test" - $475

"Accepted Cardiac Test" -$200

"Accepted Alzheimer's Test" -$150

"Accepted Beacon Carrier" - $250

"Accepted PGx Test" - $100

36. **SIADO** would then pay a kickback to individuals working for him who assisted with the door-to-door targeting of Medicare and Medicaid patients.

37. **SIADO** and his co-conspirators then used the fraud proceeds to benefit themselves and others.

Overt Acts

38. In furtherance of the conspiracy and to affect the illegal objects of the conspiracy, the following overt acts, among others, were committed in the Southern District of Georgia and elsewhere:

39. **SIADO**, aided and abetted by others, obtained the identity and a swab from numerous patients located within the Southern District of Georgia, Augusta Division, and elsewhere including

a. On or about May 13, 2019: the identity and a swab of Elizabeth C.

b. On or about May 13, 2019: the identity and a swab of Joe B.

c. On or about May 13, 2019: the identity and a swab of Patricia E.

40. **SIADO**, aided and abetted by others, then sold the identity and swab obtained, permitting Medicare and Medicaid to be billed for the fraudulent services, and received, in exchange, money from other conspirators including

11

a. On or about May 15, 2019, **SIADO** and **OPTIMUS** received a $575 kickback in exchange for the identity and a swab from Jackie, B.

b. On or about May 15, 2019, **SIADO** and **OPTIMUS** received a $575 kickback in exchange for the identity and a swab from Paula, D.

c. On or about May 15, 2019, **SIADO** and **OPTIMUS** received a $575 kickback in exchange for the identity and a swab from Russell, G.

d. On or about May 15, 2019, **SIADO** and **OPTIMUS** received a $575 kickback in exchange for the identity and a swab from Jackie, B.

e. On or about May 15, 2019, **SIADO** and **OPTIMUS** received a $575 kickback in exchange for the identity and a swab from Paula, D.

f. On or about May 15, 2019, **SIADO** and **OPTIMUS** received a $575 kickback in exchange for the identity and a swab from Russell, G.

41. On or about July 19, 2019, **SIADO** organized a meeting to recruit new individuals to obtain "customers" for a laboratory, during which meeting **SIADO** offered to pay $150 "per swab" for each Medicare or Medicaid patient an individual obtained.

All in violation of Title 18, United States Code, Section 371.

12

## COUNTS TWO THROUGH FIVE
*Health Care Fraud*
18 U.S.C. §§ 1347, 2

42.     Paragraphs 1 through 41 of this Indictment are realleged and incorporated herein by reference.

43.     Beginning no earlier than March 2019, the exact date being unknown, and continuing thereafter until at least in or about July 2019, in the Southern District of Georgia and elsewhere the defendant,

### PATRICK SIADO and OPTIMUS PRIME MARKETING, LLC,

aided and abetted by others both known and unknown, did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud the Medicaid and Medicare programs and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of the Medicaid and Medicare programs, in connection with the delivery of and payment for health care benefits, items, and services.

### Purpose of the Scheme and Artifice

44.     It was the purpose of the scheme and artifice for **SIADO** to unlawfully enrich himself and others by, among other things: (a) causing the submission of false and fraudulent claims to Medicaid and Medicare that were (i) procured by the payment of kickbacks and bribes; (ii) medically unnecessary; (iii) ineligible for reimbursement; and/or (iv) not provided as represented; (b) concealing the submission of false and fraudulent claims to Medicaid and Medicare and the receipt

13

and transfer of the proceeds from the fraud; and (c) using the proceeds of the fraud for the personal use and benefit of **SIADO** and his accomplices.

The Scheme and Artifice

45.     The Manner and Means section of Count 1 of this indictment is re-alleged and incorporated by reference.

Acts in Execution of the Scheme and Artifice

46.     To execute and attempt to execute the scheme and artifice **SIADO**, through **OPTIMUS** and aided and abetted by others both known and unknown, caused to be submitted false and fraudulent claims to Medicare and Georgia Medicaid including but not limited to those set forth in the table below on or about the dates listed below and for the patients listed below, when **SIADO** knew that his orders were procured through an unlawful kickback relationship, not ordered as medically necessary by the beneficiary's treating physician, and not payable:

| Count | Patient | Program | Claim Date | Claim Number | Laboratory | Billed Amount |
|-------|---------|---------|-----------|--------------|------------|---------------|
| 2 | P.D. | Medicaid | 05/01/19 | 2019121005975 | Company C | $30,533.33 |
| 3 | J.B. | Medicaid | 05/10/19 | 2019130008449 | Company C | $30,533.33 |
| 4 | R.G. | Medicaid | 05/17/19 | 2019137003552 | Company C | $30,533.33 |
| 5 | N.T. | Medicaid | 05/01/19 | 2019121005923 | Company C | $30,533.33 |

All done in violation of Title 18, United States Code, Sections 1347 and 2.

## FORFEITURE ALLEGATIONS

The allegations contained in Count One through Six of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 982(a)(7).

Upon conviction of one or more of the offenses set forth in Counts One through Six of this Indictment, the defendants, **PATRICK SIADO and OPTIMUS** shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(7), any property (1) constituting or derived from proceeds the defendant obtained directly or indirectly as a result of said offense(s) and all property traceable to such property; and (2) any property used or intended to the used, in any manner or part, to commit or to facilitate the commission of such offense(s).

Pursuant to Title 18, United States Code, Section 982(a)(7), upon conviction of one or more of the offenses set forth in Counts One through Six of this Indictment, charging the defendants, **PATRICK SIADO and OPTIMUS**, with a Federal health care offense, the Court shall order forfeiture of property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

If any of the property described above, as a result of any act or commission of the defendant:

a.    cannot be located upon the exercise of due diligence;
b.    has been transferred or sold to, or deposited with, a third party;
c.    has been placed beyond the jurisdiction of the court;
d.    has been substantially diminished in value; or
e.    has been commingled with other property which cannot be divided without difficulty,

15

the United States of America shall be entitled to forfeiture of substitute property

pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28,

United States Code, Section 2461(c).

A True Bill.

Bobby L. Christine
United States Attorney

Karl Knoche
Assistant United States Attorney
Chief, Criminal Division

J. Thomas Clarkson
Assistant United States Attorney
*Lead Counsel

Hank Syms
Assistant United States Attorney
*Co-lead Counsel

James P. Mooney
Special Assistant United States
Attorney
*Co-lead Counsel